Before we start our regular proceedings this morning, there are a couple of motions, so I'll turn it over to Judge Dyke. I thank Judge Csikszentmihalyi for the motion. Yes, but you've got to recognize me for the motion. Thank you. I move the admission of Robert Swanson, who is a member of the Bar and good standing in the highest court of California. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. And I'd just like to add a few personal comments. I was thinking about Robert this morning, and this is a compliment, not an insult, but it feels like he's been here for a lot longer than a year. And that's largely because he's been involved in an enormous number of issues that have come before our court and been an enormous help and service to me personally and to the court in general. And so I have every confidence he'll be a terrific advocate. And I'm particularly happy because even though he's from his beloved California, he's decided to at least stay in Washington for the foreseeable future, so I'm particularly happy about that. And I will now turn it over to Judge Hughes to also make a motion. I also have an admission. My clerk, David Maxwell, he's been with me also for a year and likewise it seemed to go by in a blink of an eye. I'm both sad that he's leaving so quickly because he's been a superb clerk and he's also worked on some really significant and important cases for me and I don't know what I would have done without him. But I'm also really excited to see him go out in the world and learn to be a lawyer because I think he's going to be a terrific attorney and he's going to be a great asset to the legal world and to our bar. So I move the admission of W. David Maxwell, who is a member of the bar and is in good standing with the highest court of Georgia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Okay. As to the first motion, Judge Hughes shall grant that? Yes. Chief Judge Prosser, your motion is granted. And as to the second motion? I agree. First case for argument, we're actually, as you've gotten notice of, we've combined these cases for argument. 15-1152 and 15-1162 Corning Incorporated v. DSM IP Assets. Mr. Goldman, whenever you're ready. Good morning. This is an appeal from the final decision by the Patent and Trademark Office Patent Trial and Appeal Board in an IPR proceeding. We think that that decision should be overturned because of fundamental mistakes with regard to claim interpretation and also analytical errors with regard to how the board handled the evidence it had in front of it. First of all, let's start with the claim interpretation. The board doesn't appear to have given a claim interpretation here. They basically said that Corning didn't meet its burden of establishing that the prior art relied on. Your theory is that if you were going to use the R2 analysis for curve fittings that you had to write it into the patent, into the claim, right? That's right. Otherwise, it's what's the relevance of the R2 to whether we met our burden. Well, the relevance would be that this established science and that's the way you measure curve fitting. Well, the question is whether it's relevant science to the validity of a cure dose limitation. So it's not just a matter of whether curve fitting is something people do. Scientists do curve fitting. The issue is what effect does curve fitting have on the claims at hand. Well, do you agree that the R2 methodology is the established way of measuring curve fitting? It's certainly a way to measure the goodness of fit of a curve to an exponential objective. So if you have an exponential... Are there alternative methods? I'm not aware of any, no. But the problem is what's the relevance of that to the claim? The claims say nothing about curve fitting. It's the relevance that the board has to determine whether the expert testimony is reliable. And one of the ways to determine that is whether it meets scientific methods. And the R2 method is one of those methods to test whether it's reliable. But you have to start with what the claims are. You can't do it in a vacuum just because curve fitting is something people do. The question is, did we meet our burden? The board starts out and says, we didn't meet our burden. But whether an expert testimony is reliable or not, and done in accordance with scientific testing methods, is a distinct question of what the claims require, isn't it? I don't think so. I think if you start, it's maybe extrinsic evidence, but it's not intrinsic. Intrinsic evidence is what does the language of the claim say? The claim has a cure dose limitation. It says nothing about R2 in it. The spec says nothing about R2 in it. The prosecution history says nothing about R2 in it. If you want to look at extrinsic evidence, you can look at R2, but there's no evidence of record that R2 was being used to interpret the claims. But the problem is that there's all sorts of scientific methodology for measurement of different things. And patents just don't spell out established scientific methodology when they're saying to do tests. And for us to say that if you don't spell it out, that you can't use it, seems to be a very strange approach. Well, the question is, is it dispositive of whether we made our case or not? I don't know how you can decide. But if it's a generally accepted scientific principle and your data doesn't match up with it, isn't the board entitled to disregard it? It's not an established scientific principle. Certainly curve fitting is something people will know. Let me ask you a hypothetical. Suppose you had a pharmaceutical claim that required a certain level of purity, say 95% purity of a drug, and it didn't say anything about how to do the testing. And your expert came in and said, I did a test and it's 95%. And the other side's expert comes in and gets a report showing your testing was not done according to a proper scientific purity testing method. Isn't the board allowed to credit that other expert and say, despite the fact that your evidence showed 95%, it's not a proper scientific method and disregard that evidence, even though that method of testing wasn't built into the claim? I think purity is a much simpler question than what we're dealing with here. Is the interest of that hypothetical yes? That they're allowed to disregard it if it doesn't follow a proper scientific method? I think if there's no question about how one determines purity, then yes. Well, suppose there's 10 different methods of doing purity testing and yours don't match up with any of them. The real question is, why does a patent claim have to spell out the proper scientific method for meeting whatever standard is, when the standards are scientifically accepted in the community? Because no one will know whether they meet the claim or not if it's open-ended as far as how you judge the cure dose limitation. We don't know. We probably will, because in any kind of claim, whether it's a pharmaceutical claim or a claim like this, there must be established scientific methods for reaching the result. I mean, you don't even dispute that the R2 method is a scientifically established method for tracking the curve. For tracking the curve, but not whether the claims are met. And whether claims are met is, do we meet this cure dose limitation or don't we? Even if the R2 is something to look at, the question goes well beyond that. The question is, well, how do you determine R2? How do you count the entire curve, or you just ignore the 0, 0 point as they do, and just count the data points at the top? Another question is, how do you… Well, now you're moving from a question of whether the R2 is built in the claim, and whether the board properly relied upon your friend's expert as opposed to your expert in what R2 meant. Well, the board did both. The board relied on their expert… I mean, if we're moving from the claim construction to the validity of the various reports, then we're into a much higher standard of review for you. Well, I still think if we're talking, if we're to say R2 is something that you can subsume within the claim limitation, you have to subsume it for everything that the board is looking at. There's nothing that says it's well established what number is sufficient with regard to a cure dose limitation. There's nothing established about what you count and what you don't count. So that creates tremendous confusion about… There's nothing that an expert in the field would say, here's how you do, as a matter of scientific practice, this method of testing. And your expert testified one way, their expert testified the other way, and the board credited their expert. But that's all a judgment of extrinsic evidence. If the plain meaning of the claim is open to whether R2 is relevant, if whether R2 has to have a certain value as to how you calculate R2, those are all issues of intrinsic evidence. So your position is you should have prevailed here, the burden was on you, and you should have prevailed in demonstrating that the prior art already had this, how? What in your view were you required to do? We were required to show that when we replicated the prior art and tested it, that the claims read on that as far as this cure dose limitation goes, that's right. Okay, but the other side, that the board can evaluate your testimony in support of that conclusion and evaluate what the other expert said with regard to what your expert said and reject your view, right? Certainly. And that would be reviewed under substantial evidence test, right? The substantial evidence test goes to whether the evidence, that there's substantial relevant evidence to support the decision of the board. So the other issue with the R2 is whether it's relevant, and if the claims say nothing about it and the board relied on that to decide the case, then there's no relevant substantial evidence to support the decision. We think this starts out with the claim interpretation being wrong, that there's no look at the intrinsic evidence here, it's ignored, and the board got it backwards by saying, look at the language of their opinion. They say, we didn't meet our burden, so we don't have to interpret the claims. How can you say we didn't meet our burden of showing that the claims read on the prior art when you don't interpret what the claims mean? And all this R2 was never presented in the context. What claims instruction did you come forward with which was rejected by the board? Because I didn't understand that you had made the claims instruction, taken a position. We, in the beginning, we presented a declaration of our expert that said the claims were broad and that they could be construed in many different ways. We followed the test method that was in the patent in question, and we figured that, you know, we believe that's sufficient to make our burden. In other words, you didn't come forward with the claims instruction. We didn't think there was anything to really argue, but when the other side started presenting this R2 thing, we can't predict where they were going to go, so when they presented their R2 issue, we came forward and we presented evidence from Dr. Reichmanis and in our remarks that reply that the claims were broad and that they could be read in a number of different ways, including following the test method, the only method that's described in the patent in question, which is what we did. So the broadest reasonable interpretation may go well beyond what we're saying we need to make our burden, but certainly subsumed within the burden, within the claims, under that broadest reasonable interpretation, is the test method that the patents in question actually set out. So that's how we, that's the claim construction we presented. We at least met it with that, and it seems reasonable that we should be able to rely on that test. The only, and let's just talk a little bit about what these patents are about. They're fast-curing films. What that means is that the claims, the films will cure quickly at a lower dose than might a slower-curing film. So if you look at page 23 of our reply brief, we have a curve here on the bottom. That's our plot, and all the data points are up on the top of that curve. So we basically, and the whole idea of this is that the data points are on the top of the curve, and that is very consistent with what the DSM publication outside of the context of litigation showed. So there's nothing wrong with having data points on the top of the curve. However, DSM's whole premise was this is bad, having the data points on the top, because your R squared is poor. Well, the only way our R squared is poor, if you ignore the 00 point, and just say, well, we're only going to look at the points up on the top of the plane, and that makes your data bad. Well, the bottom line is that it wasn't bad when they went and published it. They went and published this, and the data points look very similar. They're all the same six data points that we used, and the DSM thought that was perfectly fine to go and publish, but now all of a sudden the R squared is bad, because you're not supposed to consider the 00 point, and therefore our data is wrong. Their data was fine when they published in a reputable journal. Our data is bad now that we're litigating. The board actually, and this whole R squared business beyond that, is based on DSM's own testing. DSM's testing was with a process, a procedure that did not involve litigation. I don't understand what you're saying. The R squared analysis is based on DSM's testing? Their position on R squared was founded on looking at the test they did. They wanted to say that our- I don't understand that. Okay, let me try to- I thought they applied an R2 analysis to your data. They did, and they also did it to their own. They replicated- What does the fact that they did it to their own have to do with the decision of the board? Their data showed a better R squared than ours, because they changed the way they did the test. They purported to be comparing ours and theirs, but they changed the test. The board threw out their data, too. First of all, the board threw it out, but then relied on it and mistook their data for ours, and said that their data was ours and that we didn't make our case, because their data showed cure doses outside of the claims. That was a mistake. They clearly didn't throw it out on that front. Secondly, they didn't appreciate the import of what they were saying when they said that the data wasn't relevant. That data was presented to show that Corning did something wrong. When the board figured out that, in fact, it's not a valid basis to compare Corning's because they did the test different, it should have been thrown out for all purposes. But then they proceeded to rely on Dr. Bowman's analysis of their data, which had a very different curve. Why did it have a different curve? You can see it's a more gentle rise. Why did it have a different curve? Because they gamed the test. They made the film that they tested thicker. So it cured more slowly, and as a result, the early data points, the same data points we used following their test, showed up off the plateau and on this rapid rise region. So they could say, well, hey, we could just ignore the 0, 0 point, because we've got points that are on the curve. We get a good R-squared, and while we ignore the 0, 0 point for DSM, we ignore it for Corning, Corning has a bad R-squared because all the data points are up on the plateau. Basically, the relevance of the R-squared is based on this gamed test where they didn't follow their own procedures. Corning follows their own procedures, DSM's procedures in the patent, gets a fast-curing film just like these patents are supposed to be achieving, and their data is bad because now R-squared, which comes out of nowhere as far as these patents go, shows there's something wrong. There's nothing wrong. On A34, in the rehearing decision, the board says, we agree with DSM that Corning's failure to prove its case is entirely dependent on any faulty testing done by DSM. I'm sorry? Page 34. Yes. We agree with DSM that Corning's failure to prove its case was in no way dependent on any faulty testing done by DSM. Well, if you look at their decision on page... No, I understand what you're going to refer to, and maybe there was arguably some confusion about the board's reliance, but I think they fairly clarify that point on rehearing, right? They denied that they relied on figure one, and they clearly did. And if you look at Corning's numbers, Corning's numbers were certainly within what the claims call for. Well, they say, they conclude the paragraph that Judge Dyke was referring to, that, however, as noted in the final written decision, Corning has a burden, and we found that it had failed to establish, blah, blah, blah, making it clear that their conclusion was based on your data and the testimony relevant to your data and not the other. But our data was within the claim limitation, so I don't understand how that makes any sense. In any event, they still credited that R-squared analysis to say that there was something wrong with our data. The whole R-squared analysis is built off this different way they did the test. And the different way they did the test was making the film thicker, so it cured more slowly, so it got a more gentle rise, and therefore had a nice R-squared when you, for whatever reason, which nobody seems to explain. They say on the rehearing they're not relying on that. Well, I don't know what the board has to say that Corning did wrong, then, if they're not relying on the R-squared analysis, because that's the only thing. No, no, they're relying on the R-squared analysis of your data, but not of the DA. But there's nothing to compare it against. It's compared against theirs, and theirs was a gained result. There's nothing to say what is a good or bad R-squared here. And as Dr. Reichman has pointed out, if you take out that 0, 0 point, you're going to get a very different, and Dr. Bowman agrees, you're going to get a very different point, R-squared, than if you don't. And that's basically what they did. I'll reserve the rest of my time for rebuttal. Just to be clear, we started at 13, right? So, yeah, you've got five minutes left on the clock. Actually, it's 20. I know, but he started the clock at 13. Okay, so five minutes, all right.  Good morning. May it please the Court. These appeals do not rest on the issue of claim construction, but do rest on the issue of the sufficiency of Corning's data, and whether there's substantial evidence in the record to support the Board's decision in determining that Corning's data, the evidence on which it was relying was scientifically invalid. And the burden is on Corning as the petitioner, the burden was on Corning as the petitioner, to prove that the cure dose limitation or the 95% limitation, as that term was used by the Board, was inherently present in the prior reference, here the ZOM 157 patent. Corning hasn't pointed to any reason why there isn't sufficient evidence in the record to support the Board's decision. Because this is, there's, in fact, the 157 patent isn't even in the appendix, what Corning was relying on was the testing that it had done on codings that it had made to try to show that this cure dose property was indeed inherent in the prior art compositions. The issue of R-squared goes to the scientific validity and the accuracy of that data. The Board credited Dr. Bowman over Dr. Reichmanis in determining that Corning's evidence was not scientifically valid. And on that basis, and that the Board's, Dr. Bowman's testimony is well supported in the record, referring to the record for the 103 patent appeal, the 1052 appeal, it's well supported at paragraphs 120-32 at A-3713-23, and with respect to the 508 appeal at paragraphs 113-22 at A-3559-69. What's your response to your friend's argument on plain construction, that there should have been a plain construction, that the Board ultimately construed it by inserting the R-2, and that that does not comport with the standard of the broadest reasonable interpretation? So what, Your Honor, the plain construction is not going to matter here. Corning has no evidence to show that the limitation was met, and they're relying on this limitation being inherent. So they're relying on their test data to show it's met, and the Board has determined that the evidence, the only evidence that they're relying on to show... That seems to me to be non-responsive. The question is, if you're going to use the R-2 analysis, does it have to be in the claim? That's what they're arguing. So that's a claim construction argument. Tell us why it's wrong. Well, the R-2 or R-squared analysis goes to the quality of the data, and it's not, we would say it's not an issue of claim construction, because that's really getting into the quality of the data. It's talking about what's good scientific practice, not what the claims mean. There's not, and it's just a way to show the data that they collected that they were relying on to try to show that the property was indeed inherent. They're relying on that, and Dr. Bowman analyzed, used an R-squared analysis to analyze the validity of that data. That gets not into the issue of claim construction, but into the sufficiency of the data itself on which they were relying. So claim construction is not going to fix the validity of the data. If they have no evidence on which to rely to show that this property would be inherent in the prior art, then claim construction is irrelevant. So the board addressed that issue without the need to go in and actually make a formal construction of the cure-dose limitation. Why wouldn't a generally accepted view of the R2 method require plotting the origin point even if it wasn't measured? I mean, it seems like that makes sense, that even if they didn't specifically measure at the outset, that it would be understood that there is an origin point that you have to put into the curve along with the rest of the data. So the issue with the origin and the data, the R-squared or R2 analysis is used for curve-fitting purposes. So there's no issue that the curve, when you're doing a fitting, wouldn't go through the origin or near the origin. The issue is to take the data that was collected  using actual data. Adding in the origin, which is not actual data, then that will artificially inflate the R-squared analysis. And that's something that Dr. Bowman testified to in the transcript at A-1869-70 in the 103 patent appeal. And he said that the R-squared is supposed to rely on actual data, real data, and that if you put in perfect data, it will inflate the analysis. The board looked at that issue, the 00 issue, and said that 00, using that origin as part of the R-squared analysis, that that would not be based on actual data. It said that at A-35, and it's the rehearing decision, and said at A-24, relying on Dr. Regmanis, that she... There's no way to plot an origin point before you've applied any, I guess, whatever kind of energy you're using here based upon the chemical composition to come up with a hypothetical origin point without actually observing it. Because, honestly, I understand... You're an expert on the day, and that seems to be substantial evidence, but it really... Their argument that leaving out the origin distorts their data seems to make a lot of sense, too. If you put a point where no energy had been expended in the process, that's going to be somewhere. And it just seems to me that knowing the physical properties of whatever's going on here and the lack of energy altogether, you could come up with a hypothetical energy point. Not an end point, but a hypothetical cure point. Certainly, and Dr. Bowman testified about that a fair amount during his deposition. Sure, I guess we're bad by that.  Right, I think when you get below a certain level, it's probably more difficult to collect actual data, but you could still collect some actual data that's below certain levels to help get a better model, do a better curve fit. And putting in hypothetical or perfect data then would skew the R-squared analysis. And, in fact, Dr. Reichmanis, in paragraph 84, at A1459, she notes that she was not relying on... that Corning was taking a hypothetical zero-zero point and that when you removed that perfect point, that the R-squared analysis that she got was very similar to the R-squared analysis that DSM had done of Corning's data as well. Right, that's correct, Your Honor. To do so will skew and distort that data, the results. On a couple of other items that Mr. Goldman addressed, he was referring to a figure in Corning's reply brief at page 23 that's with the Chawla curve and trying to show that DSM had some publications that showed a curve that was similar to the results that Corning had generated. However, showing that there's something out there that has a similar curve certainly is not substantial evidence or something that the Board considered that doesn't detract from the validity or the scientific invalidity of Corning's data itself. In addition, the analysis that Corning had done on the Chawla curve that was done by Dr. Reichmanis, she acknowledges at paragraph 85 of A1459 that what she had done was digitize the curve with her own data and without any explanation of the analysis that had been done and with no underlying evidence to come up with her own sort of R-squareds and to try to show how that would compare. That's simply not relevant. This curve, other curves that were in publications, that's not relevant to show that the quality of Corning's data was somehow scientifically valid. Another issue Mr. Goldman raised had to do with DSM's testing and that's not something, as has already been noted, that's not something on which the Board relied. The Board was very specific in saying that in the decision on the request for rehearing to say that they were not relying on DSM's testimony at A34,  and with respect to thicker coatings or having faster curing coatings, the R-squared issue has more to do with the quality of the data, analyzing the quality of the data. It doesn't have to do with what the coating is that's being tested. And what Corning is essentially doing now is trying to rehash and re-argue a credibility determination on appeal. The Board was thorough in weighing the evidence. Corning wants to re-weigh it here. There's substantial evidence in the record to support the Board's decision. The claim construction issue doesn't fit the validity of the data and this Court should affirm. Unless there's any further questions, I will conclude my argument. Thank you. A few points in response. The zero-zero point is not hypothetical. It is undisputed that the data goes through the zero-zero point. The problem is you can't measure a modulus at a dose of zero. The coating has a modulus of zero. You can't measure that on the equipment. So the idea that there's something wrong with considering that because it's not real data is incorrect. It is real data. Everybody knows that's there, and the manipulation of removing that point to say, well, all the data is on a flat and it doesn't meet a curve, is pretty transparent. It's all playing with numbers to get a result. The other alternative was, oh, let's add a data point in, so an extra data point on a lower dose, not one of the ones that we were told to follow, but go ahead and do that and you'll get a better R-squared. Well, yeah, because it will be down on the curve more. None of that speaks to the real issue, which is where does Corning's data cross the barrier of the 95% of total modulus, of final modulus, and is that below the .65 value? That's the only issue that matters here. The points where that's going to happen, whether you're above .65 or whether you're not, is to the right on the curve compared to what we're talking about, which is on the left at the lower doses. It doesn't matter. It's not going to affect the outcome of the result. Clank construction, I don't know, I guess I always thought clank construction always matters, and how we can say that we didn't meet our burden of showing that the art met the claims is hard to fathom. Going back again to the business of whether you look at the origin or whether you don't look at the origin, all that is grounded in looking at a strained view of the description of the test method that's in the patents in question. It says you need to fit a curve to the data point. It doesn't say why you're doing it. It says nothing about R squared. Dr. Reichman has testified, and it's pretty obvious, you're fitting that curve to figure out where you cross the 95% value and whether you're below or above the .65 number that you have to meet for the claim. It doesn't say anything about fitting the data for R squared. It doesn't say anything about whether you look at the data, the number at 00, because it doesn't matter. It's well below the .65 value. So it's a strained reading to say that somehow the spec is requiring a removal of the 00 point. At the end of the day, that's all Dr. Bowman has, is that strained reading, because at the end of the day, the 00 point is something that's valid. It gives the logarithmic or the exponential curve to the data, and if you pay attention to that, you'll see that the R squared is perfectly proper. As far as the Chawla reference that we talked about, that is DSM's own data. The data points are in the same place as ours. They took them at the same six points, same six doses, and they're all up on the top of the curve. DSM didn't think that was anything wrong there, and so basically the patent office ignored that and said, well, there's something wrong with Corning's data because the R squared is off. But the R squared is just, as Dr. Reichmanis pointed out, the R squared is worse for DSM's data than it is for Corning's as far as looking at it without considering the 00 point. So again, we think claim interpretation is important. We don't see how the board can properly reach the conclusion that we didn't meet our burden as far as whether the prior art was read upon by the claims without knowing what the claims mean. And the way things are left now, nobody really knows what these claims mean. Nobody knows what kind of R squared you have to have, how you're supposed to plot the data, how many points you count. It's all left in the air, and we don't think that's an appropriate way to resolve the situation. Unless there's any further questions, I have nothing else to say. Thank you. We thank both counsel and the cases are submitted.